# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

————————————————————————— )
)
ST. LAWRENCE SEAWAY PILOTS'      )
ASSOCIATION, et al.,             )
)
)
Plaintiffs,              )
)
v.                           )          Civil Action No.:  03-1204 (RBW)
)
ADMIRAL THOMAS H. COLLINS,       )
Commandant,  United States Coast Guard, )
)
Defendant.              )
————————————————————————— )

## <u>MEMORANDUM OPINION</u>

This lawsuit was initiated by the St. Lawrence Seaway Pilots' Association ("SLSPA"),[1]

the Lakes Pilots Association, Inc. ("LPA"),[2] and the Western Great Lakes Pilots Association

("WGLPA")[3] (collectively "plaintiffs" or "pilots' association") pursuant to the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706(1).  Complaint Seeking Mandatory Injunctive Relief for

Agency Action Unlawfully Withheld, Declaratory Relief, and Review of Agency Action

("Compl.").   The plaintiffs allege that the defendant, Thomas H. Collins, Commandant of the

United States Coast Guard, has violated the APA by "fail[ing] to discharge [his] legal duty to

---

[1]  SLSPA represents 11 pilots and is headquartered in Cape Vincent, New York.  Compl. ¶ 7.  SLSPA has ship pilotage jurisdiction over the waters of Lake Ontario, the St. Lawrence River, and connecting waterways, which is collectively referred to as "Pilotage District One."  Id.

[2]  LPA represents 13 pilots and is headquartered in Port Huron, Michigan.  Compl. ¶ 8.  LPA has ship pilotage jurisdiction over the waters of Lake Erie, the Detroit River, the St. Clair River, and connecting waterways, which collectively is referred to as "Pilotage District Two."  Id.

[3]  WGLPA represents 21 pilots and is headquartered in Superior, Wisconsin.  Compl. ¶ 9.  WGLPA has ship pilotage jurisdiction over the waters of Lake Superior, Lake Michigan, Lake Huron and connecting waterways, which is collectively referred to as "Pilotage District Three."  Id.

1

review and, where appropriate, recalculate pilotage rates annually pursuant to the Great Lakes

Pilotage Act of 1960, 46 U.S.C. §§ 9301-9308." Compl. ¶ 1. Currently before the Court are

dispositive motions filed by both parties.[4] For the reasons set forth below, this Court denies both

the plaintiffs' motion for summary judgment and the defendant's motion to dismiss.

## I. Background

**(A)      Statutory Background**

Foreign ships engaged in foreign trade that travel on the Great Lakes must hire an

experienced American or Canadian pilot to provide navigational services on such vessels as

required by the Great Lakes Pilotage Act of 1960, codified at 46 U.S.C. §§ 9301-9309 (2000)

("GLPA"). The GLPA authorizes the Secretary of Homeland Security to license pilots and

determine the rates that pilots may charge for their services. 46 U.S.C. § 9303(f). The Secretary

has delegated this ratemaking authority to the Commandant of the Coast Guard ("Commandant")

pursuant to 46 U.S.C. § 2104, who has in turn delegated his authority to the Director of the Great

Lakes Pilotage Office ("Director" or "GLPO") to implement regulations found at 46 C.F.R. Parts

401-404.

The Act itself does not set forth a specific formula for calculating pilotage rates. Id.

Rather, the methodology for calculating pilotage rates is set forth in a Final Rule and regulations

---

[4]  Specifically, pending resolution are (1) the Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") and Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment ("Pls.' Mem."); (2) the Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n"); and (3) the Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply"). Also before the Court are (1) the Defendant's Motion to Dismiss ("Def.'s Mot.") and Memorandum in Support of Motion to Dismiss ("Def.'s Mem."); (2) the Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Pls.' Opp'n") and (3) the Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Def.'s Reply"). The arguments raised by the parties in both sets of pleadings are virtually identical. Accordingly, the Court, unless otherwise noted, will cite primarily to the pleadings related to the plaintiffs' motion for summary judgment.

issued by the Commandant in 1996.  61 Fed. Reg. 21,081 (1996).  Under the regulations

> Great Lakes pilotage rates shall be reviewed annually in accordance with the procedures detailed in Appendix C  . . . . [And] [t]he Director shall review Association audit reports annually and, at a minimum, the Director shall complete a thorough audit of pilot association expenses and establish pilotage rates in accordance with the procedures detailed in § 404.10 of this part at least once every five years.

46 C.F.R. § 404.1 (2005).  Moreover, under this regulation, an interested party may petition to

have a review of the rates conducted before the five-year period expires.  Id.  The appendices to

part 404 detail two different comprehensive methodologies for determining pilotage rates

pursuant to 46 C.F.R. § 404.1.  A seven step ratemaking process is detailed in appendix A, which

is used by the Director to determine base pilotage rates at least once every five years, while

appendix C details an eight step process to be used in intervening years.  46 C.F.R. Pt. 404,

App's A & C.[5]  The dispute in this case centers not around the substance of any particular

rulemaking, but rather, whether the Director has unreasonably delayed completing the

rulemakings required under 46 C.F.R. § 404.1.  Specifically, the plaintiffs assert that a

rulemaking commenced in December 2001 has been unreasonably delayed.  Pls.' Mem. at 7.

**(B)    Factual Background**

Under the applicable statutory and regulatory framework, base pilotage rates for Great

Lake pilots were set in 1997.  62 Fed. Reg. 5917 (1997); see also Plaintiffs' Rule 56.1 Statement

of Material Facts as to Which There is No Genuine Issue ("Pls.' Stmt.") ¶ 8.  In 1998, after an

annual review, "the Coast Guard concluded that no changes were necessary to the Great Lakes

pilotage rates for the 1998 navigation season."  63 Fed. Reg. 68,697 (1998); see also Pls.' Stmt.

---

[5]46 C.F.R. Pt. 404, App. B provides definitions to be applied in the ratemaking formulas contained in appendices A and C.

¶ 9.  In April 2000, the Director proposed to "minimally change the rates for the 2000 season to prevent a large rate change in future years."  65 Fed. Reg. 20,110, 20,111. This review, conducted in 1999 and based on data from 1997, utilized the methodology in 46 C.F.R. Pt. 404, App. A (detailing the methodology for the five year review).  See 65 Fed. Reg. 20,110, 20114-18 (2000); see also Pls.' Stmt. ¶ 11.  These proposed changes were implemented in 2001.  66 Fed. Reg. 36,484 (2001); see also Pls.' Stmt. ¶ 12.  The 2001 rulemaking was challenged in this and other Courts, and on April 3, 2003, this Court concluded that "certain aspects of the defendant's 2001 Final Rule [were] arbitrary and capricious" as it applied to the Lake Pilots Association. Lake Pilots Ass'n, Inc. v. United States Coast Guard, 257 F. Supp. 2d 148, 175 (D.D.C. 2003). Thus, this Court remanded to the Coast Guard the 2001 rulemaking for further proceedings consistent with the Court's opinion.  Id.  In light of this court's ruling, and other litigation that ensued as a result of the 2001 rulemaking, the Coast Guard in 2002, issued a temporary rule, which eliminated a 5% decrease that had been imposed on District Two pilots in 2001, 67 Fed. Reg. 47,464 (2002); see also Pls.' Stmt. ¶ 13, and indicated that the Coast Guard would soon be issuing notice of a new proposed rulemaking.

The Coast Guard has represented to this Court and others that it would issue a notice of proposed rulemaking but has failed to do so for a significant period of time.  For example, on December 6, 2001, the Coast Guard represented to another member of this Court that "the proposed rate for next season will soon be published as a Notice of Proposed Rulemaking."  Pls.' Mem, Ex. 4.  Moreover, on May 13, 2002, the Director indicated that he planned to issue a Notice of Proposed Rulemaking that same month.  67 Fed. Reg. 33,413-14 (2002).  Again in December 2002, a statement in the Federal Register indicated that the Notice of Proposed

Rulemaking would be issued in November 2002. 67 Fed. Reg. 74,853 (2002). Despite these

pronouncements, the Notice of Proposed Rulemaking was not issued until January 23, 2003. 68

Fed. Reg. 3202 (2003). This proposed rulemaking, utilizing the five-year methodology,

projected a substantial rate adjustment for 2003. Id. at 3204-05. The defendant asserts that the

delay in completing the rulemaking has been caused, in part, by the plaintiffs' failure to timely

supply the necessary information for the defendant to calculate a new base pilotage rate. Def.'s

Opp'n at 6. Thus, according to the defendant, the calculations for the new rate were not

completed until November 30, 2002. Id.

Once the Coast Guard issued the notice of the proposed rulemaking, which purported to

adjust the Great Lakes pilotage rates pursuant to the methodology in 46 C.F.R. Pt. 404, App. A

(detailing the methodology for the five year review), the Coast Guard twice extended the period

for comments to be submitted regarding the proposed rulemaking. See 68 Fed. Reg. 7489

(extending comment period until April 24, 2003); 68 Fed. Reg. 15,697 (extending comment

period until May 1, 2003). The comment period finally closed on May 1, 2003. 68 Fed. Reg.

15,697. Over eighty of the comments submitted in response to the notice of the proposed

rulemaking were received after April 25, 2003. See, e.g., Administrative Record ("A.R."), Ex.

79-131. In addition, many of the commenters suggested that the substantial size of the pilotage

rate increase would have a negative economic impact on the maritime community in the Great

Lakes region. See, e.g., A.R., Ex. 7-9. Thus, due to the concerns raised in the comments, the

Coast Guard contracted with Martin Associates to conduct an economic analysis to assess the

impact the rate increase would have. Def.'s Opp'n at 9. Rather than waiting for that report

before taking action, the Coast Guard issued an interim rule, which contained new rates that took

effect in January 2004.  68 Fed. Reg. 69,564 (2003).  This interim rule was published "while the

Coast Guard complete[d] its evaluation of issues raised in response to the [notice of the proposed

rulemaking] and calculates a full rate adjustment."  68 Fed. Reg. 69,564 (2003).

To date, the final rule has not been issued.  Based upon status reports provided to this

Court, it appears that the final rule is still working its way through the administrative process.

On June 22, 2005, the Office of Management and Budget determined that this rulemaking, which

is the subject of this litigation, amounts to a "significant" rulemaking under Executive Order

12,866, which is entitled Regulatory Planning and Review.[6]  Defendant's Status Report of July

22, 2004 at 2.  As a result of this determination, additional staffing within the Coast Guard was

required, including increased staffing levels in offices that had not previously reviewed the rule.

Id.  In addition, the defendant went on to inform the Court that this rulemaking still needed to be

approved by the Commandant of the Coast Guard, the Department of Homeland Security, and the

Department of Transportation before final OMB review could be conducted.  Id. at 3.

---

[6]  Under § 3(f) of Executive Order 12,866, a

"Significant regulatory action" means any regulatory action that is likely to result in a rule that may:
>(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material
>way the economy, a sector of the economy, productivity, competition, jobs, the environment,
>public health or safety, or State, local, or tribal governments or communities;
>(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another
>agency;
>(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the
>rights and obligations of recipients thereof; or
>(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the
>principles set forth in this Executive order.

Exec. Order No. 12,866, sec. 3(f), 58 Fed. Reg. 51,735 (Oct. 4, 1993).

## II.   The Parties' Positions

The pilots' associations have brought this lawsuit alleging that the defendant has been derelict in carrying out his responsibilities under the Great Lakes Pilotage Act of 1960. Namely, the plaintiffs argue that the "Coast Guard has failed to conduct annual reviews of, and make necessary adjustments to pilotage rates in most years since 1996." Compl. ¶ 21. Notably, the plaintiffs state that

> [i]n the seven years since the requirement for such annual reviews was adopted in 1996, the Coast Guard has conducted the annual review only three times and made adjustments only twice. Pilotage rates on the Great Lakes have thus been adjusted only twice in the last decade, and the most recent of those adjustments was found to be "arbitrary and capricious" by this Court.

Id.[7] The plaintiffs contend that the Coast Guard has repeatedly failed to adhere to the deadlines it has designated for the publication of a new rule. Id. ¶ 30. And, despite the fact that the 2003 shipping season began on March 31, 2003, id. ¶ 32, in its May 27, 2003, semi-annual "regulatory review . . . [the Coast Guard] estimated [that] the final rule would be issued on 12/00/03" without providing a basis for this estimate. Id. ¶ 28. Additionally, the plaintiffs note that the defendant has not issued "any regulation correcting the errors [in the 2001 Rule] or responding in any way to [this Court's] remand." Id.

In an effort to force the defendant to publish a final rule expeditiously, the plaintiffs have

---

[7] The plaintiffs are referring to this Court's Memorandum Opinion issued on April 4, 2003, in which the Court ruled that "certain aspects of the [Coast Guard's 2001] Final Rule [were] arbitrary and capricious." Lake Pilots Ass'n, 257 F. Supp. 2d at 175. Specifically the Court held that

> the defendant should not have exclusively relied on a ship operating company's benefits data as the basis for determining the amount of benefits to be included in its calculation of the target rate of pilot compensation; it should not have excluded cash from the Association's investment base on a basis not provided for in its regulations; and it has conceded to a possible error in denying some of the Association's subsistence expenses.

Id.

filed the complaint in this action pursuant to the APA.[8]  The plaintiffs contend that applying

established precedent from the District of Columbia Circuit in Telecomms. Research & Action

Ctr. ("TRAC") v. FCC, 750 F.2d (D.C. Cir. 1984) and MCI Telecomms. Corp. v. FCC, 627 F.2d

322 (D.C. Cir. 1980), it is clear that the defendants have unreasonably delayed the issuance of a

final rule regarding pilotage rates.[9]  Pls.' Mem. at 12-13, 15-21.

In opposition, the defendant advances several reasons why the plaintiffs are not entitled to

injunctive and mandamus relief.  First, the defendant argues that contrary to plaintiffs'

"assertions, the Great Lake pilotage ratemaking methodology does not require an annual

adjustment of pilotage rates."  Def.'s Opp'n at 3.  Rather, he contends that the pilotage

regulations require that an annual review shall be conducted in accordance with 46 C.F.R. 404

Appendix C.  Id.  And, because according to the defendant, the Coast Guard is required only to

adjust pilotage rates "every five years," and the Coast Guard decided to conduct a thorough audit

of the pilot associations' expenses in 1997, 2001, and 2002, they have satisfied their statutory

and regulatory obligations.  Id. at 3-4.  Moreover, according to the defendant, the most recent

rates for pilotage services performed on the Great Lakes became effective on January 12, 2004.

Id. at 4.  Accordingly, the defendant contends that since no statutory or regulatory duty has been

---

[8]  In counts one and two of the complaint, the plaintiffs seek mandatory injunctive and mandamus relief, requiring the Coast Guard to "complete its review and adjustment of pilotage rates within 20 days, and to issue a rule adopting the revised rates . . . ."  Id. ¶ 47.  In count three, the plaintiffs seek a declaratory judgment holding "that the Coast Guard has violated its legal duties and its obligations under the Great Lakes Pilotage Act and its regulations, and under the [APA]."  Id. ¶ 53.  Finally, in count four, the plaintiffs allege that the "[d]efendant has acted arbitrarily and capriciously, abused its discretion, and acted contrary to law, within the meaning of 5 U.S.C. §§ 706(2)(A) and 706(2)(D)" by failing to complete its review and adjustment of pilotage rates within the required timeframes.  Id. ¶ 55.

[9]  On June 30, 2003, the plaintiffs filed a motion for a preliminary injunction seeking an order from this Court requiring the defendant to issue a rule within 20 days adopting revised pilotage rates.  On July 11, 2003, this Court denied the motion and the parties proceeded to file dispositive motions, which are the subject of this opinion.

violated, the plaintiffs' complaint must be dismissed for failure to state a claim upon which relief

can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  Def.'s Mem. at 4.  Finally,

the defendant opines that even if the plaintiffs have properly asserted a claim under the APA, any

delay in issuing a final rule was reasonable.  Def.'s Opp'n at 5.

### III.    Standards of Review

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a motion for summary

judgment, this Court must view the evidence in the light most favorable to the non-moving party.

Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992).  However, the

non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific

facts showing that there [are] genuine issue[s] for trial."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986) (citation omitted).  Under Rule 56, "if a party fails to establish the existence

of an element essential to that party's case and on which that party will bear the burden of proof

at trial" summary judgment is warranted.  Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C.

1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  The party moving for

summary judgment bears the burden of establishing the absence of evidence to support the non-

moving party's case.  Id. at 122.  In considering a motion for summary judgment, "the court must

draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 150 (2000).

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16 F.3d at 1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference into the complaint, and matters about which the Court may take judicial notice.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).  The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

## IV.    Legal Analysis

The APA directs agencies to complete matters presented to them "within a reasonable time," 5 U.S.C. § 555(b), and affords this Court with authority to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); see TRAC, 750 F.2d at 76. The District of Columbia Circuit in TRAC, 750 F.2d at 80, delineated "the hexagonal contours of a standard" for determining whether an agency action has been unreasonably delayed based on a collective "reading" of existing Circuit precedent.  And the Court noted that "[a]lthough the standard is hardly ironclad, and sometimes suffers from vagueness, it nevertheless provides

useful guidance in assessing claims of agency delay  . . . .  <u>Id.</u> [10]  The six factors that comprise the

test are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason" . . . ;
> (2) where Congress has provided a timetable or other indication of the speed with which
> it expects the agency to proceed in the enabling statute, that statutory scheme may supply
> content for this  rule of reason . . . ; (3) delays that might be reasonable in the sphere of
> economic regulations are less tolerable when human health and welfare are at stake . . . ;
> (4) the court should consider the effect of expediting delayed action on agency activities
> of a higher or competing priority . . . ; (5) the court should also take into account the
> nature and extent of the interests prejudiced by the delay . . . ; and (6) the court need not
> "find any impropriety lurking behind agency lassitude in order to hold that agency action
> is 'unreasonably delayed.'"

<u>Id.</u> (internal citations omitted).  "Resolution of a claim of unreasonable delay is ordinarily a

complicated and nuanced task requiring consideration of the particular facts and circumstances

before the court."  <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1100

(D.C. Cir. 2003).  The Court will address each of the six factors that comprise this test.

**(A)       The Rule of Reason**

First, in assessing the reasonableness of the delay in issuing a new rule, "[c]ourts must

consider the agency's justification for the pace of its decision."  <u>Muwekma Tribe v. Babbitt</u>, 133

F. Supp. 2d 30, 36 (D.D.C. 2000) (citation omitted).  While it may be the case "[i]n certain

situations [that] administrative delays may be unavoidable . . . extensive or repeated delays are

unacceptable and will not justify the pace of action."  <u>Id.</u> (citation omitted).  In <u>Muwekma</u>, Judge

Urbina held that the Bureau of Indian Affairs' delay in issuing a decision regarding the plaintiff

tribe's petition for federal recognition was unreasonable, in part because

---

[10]  This test was established for situations where mandamus relief is requested.  In this case, although
mandatory injunctive relief is being sought, Compl. ¶¶ 44-47, the plaintiffs are primarily seeking relief in the nature
of a mandamus compelling the Coast Guard to issue new pilotage rates. Compl. ¶¶ 48-50.  Accordingly, this is also
the proper test to apply in this situation.

the BIA came under a duty to act as of March 26, 1998, [h]owever, the defendants' refusal to provide the plaintiff with a definite time frame for review of its petition [did] not enable the court to evaluate any prospect of completion. . . . The court conclude[d] that the ambiguous, indefinite time frame for review of the plaintiff's petition constitutes unreasonable delay within the meaning of APA § 706(1).

Id. at 37.  Although "[t]here is 'no per se rule as to how long is too long' to wait for agency action, . . . a reasonable time for agency action is typically counted in weeks or months, not years."  In re American Rivers and Idaho Rivers United, 372 F.3d 413, 419 (D.C. Cir. 2004) (internal citation omitted) (citing Midwest Gas Users Ass'n v. FERC, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[T]his court has stated generally that a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'")).  In American Rivers, the District of Columbia Circuit concluded that a six-year delay was unreasonable.  Id.  The Circuit Court has called into question similar delays in other cases.  See, e.g., Pub. Citizen Health Research Group v. Brock, 823 F.2d 626, 629 (D.C. Cir. 1987) (six-year delay "tread[ed] at the very lip of the abyss of unreasonable delay."); Air Line Pilots Ass'n, Intl v. Civil Aeronautics Bd., 750 F.2d 81, 86 (D.C. Cir. 1984) (five-year delay unreasonable); Pub. Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1157-59 (D.C. Cir. 1983) (per curiam) (three-year delay unreasonable); MCI Telecomms. Corp. v. FCC, 627 F.2d 322, 324-25, 338-42  (D.C. Cir. 1980) (four-year delay unreasonable).  These cases, while helpful, provide only some guidance because the determination is necessarily based on the specific facts and circumstances of each individual case.  Mashpee Wampanoag Tribal Council, 336 F.3d at 1100.

Here, it appears that there have been two substantial delays in the process of promulgating the new pilotage ratemaking.  First, the delay between December 2001, when the Coast Guard first announced that it intended to issue a new Rule, and January 2003, when the

Director finally issued a notice of proposed rulemaking.  This period of delay, a little over a year,

was not, based on the facts and circumstances, unreasonable.  During this time period, the

Director had to comply with the methodology set forth in 46 C.F.R. Pt. 404, App. A.  Under Step

1.A of this methodology, each pilots' association "is responsible for providing detailed financial

information to the Director" by April 7 annually, which is then used to determine pilotage rates.

See 46 C.F.R. Pt. 404, App. A; 46 C.F.R. § 403.300.  According to the defendant, despite this

requirement, the associations did not comply with this deadline.  Def.'s Opp'n at 6.  Thus, the

Coast Guard could not complete its 2001 audit based on figures that were due April 7, 2002, until

November 30, 2002.  Id.  And a final report from the auditors was not completed until January

20, 2003.  See A.R. Ex. 4.  In any event, it is clear that even if the pilots' associations was not

delinquent in submitting the requisite documentation to the Coast Guard, a nine and one-half

month delay to collect the requisite financial information, conduct the audit, and issue a final

report was not unreasonable.

As to the second period of delay, the Court concludes that the time between the issuance

of the notice of proposed rulemaking (January 23, 2003) and the issuance of the final rule, which

has not yet occurred, is not at this point unreasonable.  The notice of proposed rulemaking issued

on January 23, 2003 noted that a public hearing on the proposed rule would be held on January

31, 2003, and requested any comments by March 10, 2003.  68 Fed. Reg. 3202.  On February 14,

2003, the Coast Guard extended the comment period until April 24, 2003.  68 Fed. Reg. 7489.

And on April 1, 2003, the Coast Guard again extended the comment period until May 1, 2003.

68 Fed. Reg. 15697; A.R. Ex. 62.  The Administrative Record reflects that many commenters

requested these extensions.  See, e.g., A.R., Ex. 7 (letter from Wagenborg Shipping B.V. asking

that the comment period be extended); Ex. 8 (letter from Fednav International Ltd. seeking an

extension); Ex. 9 (letter from American Great Lakes Ports seeking an extension); Ex. 12 (letter

from Canfornav Limited seeking an extension); Ex. 26 (letter from Toledo-Lucas County Port

Authority seeking an extension); Ex. 34 (letter from Halverson Associates seeking an extension).

Thus, there is clear support in the record for the Coast Guard's decision to delay the close of the

comment period.  Moreover, the extended comment period, which totaled 99 days[11] was not

outside the time period anticipated by the Coast Guard for the receipt of comments.  Defendant's

Opposition to Plaintiff's Motion for a Preliminary Injunction; Declaration of Commander Brian

Judge ("Judge Declaration"); Tab A at 2.  According to the Coast Guard Headquarters Instruction

M16703, Regulatory Development and Review,

> Coast Guard policy is to provide a comment period of <u>at least</u> 90 days to allow for more
> widespread notification to the regulated communities by articles in industry or regulated
> community and publications.  Specific explanation must be given for a comment period
> of less than 90 days.  <u>A longer comment period should be used when a rule would apply
> to a diverse community</u>, such as recreational boaters, <u>that may not quickly become aware
> of the rule.  A longer comment period should also be used if a rule involves complex,
> technical issues that may require detailed analysis and evaluation for a meaningful
> response.</u>

<u>Id.</u> (emphasis added).  Thus, the 99 day comment period in this case was simply not

unreasonable, and in fact was consistent with existing Coast Guard regulations.

Moreover, any delay between the time the comment period ended and the date of the

issuance of this opinion has not been unreasonable.  The Great Lakes Pilotage Act "specifically

requires the Coast Guard [to]give 'consideration to public comments' in setting pilotage rates."

46 U.S.C. § 9303(f).  Thus, the Coast Guard was required to consider every comment it received.

---

[11] This includes the date the notice of proposed rulemaking was issued and the date the comment period
closed.

As previously noted, over eighty of these comments were received after April 25, 2003.  Many of these comments suggest that the substantial amount of the pilotage rate increase would harm the maritime community in the Great Lakes region, as well as importers and exporters who ship cargo over the Great Lakes.  See, e.g., A.R., Ex. 32 (letter from Minnesota Agri-Grown Coulcil); Ex. 33 (letter from Federal Marine Terminals, Inc.); Ex. 47 (letter from Deringer); Ex. 50 (letter from World Shipping, Inc.); Ex. 56 (letter from Lake Superior Warehousing Co.).  In response to these concerns, the Coast Guard contracted with Martin Associates to produce a report detailing exactly what impact the proposed rates would have on the Great Lakes region.  See 68 Fed. Reg. 69,564, 69,565-66 ("The Coast Guard has contracted with Martin Associates to perform a full economic review of the Great Lakes basin.").  It was certainly reasonable and appropriate for the Coast Guard to contract for such a review, especially given the substantial change the proposed rule recommended.  Moreover, in an effort to help ensure that the rulemaking progressed, rather than waiting for this report to be completed, the Coast Guard issued an interim rule in December 2003 that provided a partial adjustment of the pilotage rates.  Id. at 69,564.  In addition, the Coast Guard has represented to the Court that the final rulemaking has been deemed a "significant" rulemaking by OMB and now must be subjected to an even more extensive review process, allegations not refuted by the plaintiffs.  These explanations for the delay are not facially unreasonable.

Despite these delays, it is clear that the Coast Guard is not neglectfully failing to proceed with the rulemaking, but rather has worked diligently to complete it.  Accordingly, based on the foregoing review of the historical record, the Court must find that the delay is justified and well within the rule of reason.  Compare Muwekma Tribe, 133 F. Supp. 2d at 37 (plaintiff tribe's

petition for federal recognition had been pending for at least four years and "there [was] no clear end in sight to the processing of the plaintiff's petition."). Therefore, the first factor of the <u>TRAC</u> standard weighs in the defendant's favor.

**(B)      Statutory Guidance's Impact on the Rule of Reason**

Regarding the second TRAC factor, "[i]f a specific deadline for final agency action is provided by Congress, the reasonableness of the delay can be measured in relation to this deadline." <u>Muwekma Tribe</u>, 133 F. Supp. 2d at 38 (citing <u>In re Center for Auto Safety</u>, 793 F.2d 1346, 1353 (D.C. Cir. 1986)). In this case, the Court is not dealing with a duty prescribed by statute, but rather one created by agency regulations. Thus, application of the second <u>TRAC</u> factor requires this Court to construe the relevant regulations to determine whether there is a specific deadline for final agency action. When reviewing agency regulations, the Court

> must give substantial deference to an agency's interpretation of its own regulations. [The Court's] task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.

<u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (inner quotations and citations omitted). Thus, this Court must "accord an agency's interpretation of its own regulations a 'high level of deference,' accepting it 'unless it is plainly wrong.'" <u>Gen. Elec. Co. v. EPA</u>, 53 F.3d 1324, 1327 (D.C. Cir. 1995) (quoting <u>Gen. Carbon Co. v. OSHRC</u>, 860 F.2d 479, 483 (D.C. Cir. 1988)). However, "[a]s the Supreme Court recently stressed, . . . judicial deference towards an agency's interpretation 'is warranted only when the language of the regulation is ambiguous.'" <u>In re Sealed Case</u>, 237 F.3d 657, 667 (D.C. Cir. 2001) (quoting <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000)). Here, the language of the regulation at issue is not ambiguous, and the

Coast Guard's interpretation of it is consistent with the clear mandate set forth in the regulation.

Accordingly, this Court need not engage in an extensive interpretative effort.

The regulation provides that

Great Lakes pilotage rates shall be reviewed annually in accordance with the procedures detailed in Appendix C to this part.  The Director shall review Association audit reports annually and, at a minimum, the Director shall complete a thorough audit of pilot association expenses and establish pilotage rates . . . at least once every five years.

46 C.F.R. § 404.1(b) (2003) (emphasis added).  The regulation on its face makes clear that, at a

minimum, the Director shall establish new pilotage rates at least once every five years.  It is not

disputed that the Director established new rates in 1997 and again in 2001.[12]  Thus, under the

regulation, pilotage rates need not be adjusted again until 2006.  Thus, at least with respect to the

five year review, the Coast Guard has satisfied this requirement.

The regulation also calls for an annual review of pilotage rates.  However, this annual

review does not mandate pilotage rate changes.  This conclusion is called for because the

regulation on its face contemplates only mandatory adjustments every five years.  Moreover, an

examination of Appendix C of the regulation clearly indicates that the regulatory scheme does

not require an annual rate change.  46 C.F.R. Pt. 404, App. C.  Appendix C specifically states

that "the Director will review, if warranted by cost changes, recalculate base pilotage rates . . . ."

Id.  Moreover, 46 C.F.R. § 404.10(a) notes that "[p]ilotage rates actually implemented may vary

from the results of the calculations in appendices A, B, and C . . . because of agreements with

Canada requiring identical rates, or because of other circumstances to be determined by the

Director."  46 C.F.R. § 404.10(a).  Thus, based on the clear language of the regulations, any

---

[12]  Although the rulemaking establishing the 2001 was remanded, in part, back to the agency, it does not alter the fact that the Director complied in a timely manner with the five year obligation.

changes in pilotage rates based upon the annual review are discretionary.  Furthermore, there is

nothing submitted by either party that suggests that Congress has been dissatisfied with the

process by which pilotage rates have been calculated.  See Masphee Wampanoag Tribal Council,

Inc. v. Norton, 180 F. Supp. 2d 130, 135 (D.D.C. 2001) ("Congressional inaction suggests, if not

satisfaction, at least acceptance of the pace of BIA decisionmaking.  This factor accordingly

weighs in BIA's favor . . ."), rev'd on other ground, 336 F.3d 1094 (D.C. Cir. 2003).  Cf.

Muwekma Tribe, 133 F. Supp. 2d at 39 (holding that despite the existence of a congressionally

mandated timetable for action, the court did not believe "that Congress intended petitions to

languish in the review process indefinitely.").  Accordingly, there is no statutory or regulatory

obligation requiring the Director to establish new rates annually.  Rather, he must only do so at

least once every five years, which has been complied with.[13]  Thus, this factor also weighs in

---

[13]  The gravamen of the defendant's motion to dismiss is that there is simply no statutory or regulatory duty
that requires the Coast Guard to adjust pilotage rates annually and thus there is no applicable standard to compel
agency action under the APA.  Def.'s Mem. at 3.  To support its argument, the defendant cites to a recent case from
the District of Columbia Circuit, which states that a

> consideration of any and all mandamus actions starts from the premise that issuance of the writ is an
> extraordinary remedy, reserved only for the most transparent violations of a clear duty to act.  In the case of
> agency inaction, we not only must satisfy ourselves that there indeed exists such a duty, but that the agency
> has 'unreasonably delayed' the contemplated action.

In re Bluewater Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000).  While it is clear that the agency must have some
duty to act, Bluewater does not support the proposition that there must be some mandatory duty to act.  Here, the
regulations clearly create a duty requiring Coast Guard action.  See 46 C.F.R. § 404.1 - 404.10. Thus, as the Circuit
Court noted in Bluewater, if there is a duty to act, then the Court should employ the now familiar TRAC factors.  It is
when analyzing the second of those factors, as this Court has done above, that the Court became concerned about
whether there is a mandatory as compared to a discretionary duty to act.  The defendant's argument is similar to the
argument raised by the defendants and rejected by the District of Columbia Circuit in Mashpee.  In Mashpee, the
Secretary of the Department of the Interior argued that because the Bureau of Indian Affairs "did not in its
regulations impose upon itself a 'mandatory, nondiscretionary duty to begin to consider the Mashpee petition' by a
time certain, the district court 'lacked jurisdiction to exercise mandamus to compel the [Secretary] to place the
Mashpee petition on active consideration.'" Mashpee, 336 F.3d at 1099.  The District of Columbia Circuit rejected
that argument and concluded that

> Mashpee did not seek an order directing the BIA to comply with its own regulations. Rather, Mashpee's
> claim arose under the Administrative Procedure Act, which imposes a general but nondiscretionary duty
> upon an administrative agency to pass upon a matter presented to it "within a reasonable time," 5 U.S.C. §
> 555(b), and authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably

(continued...)

favor of the defendant.

**(C)     The Nature and Extent of the Interests Affected by the Delay and the Potential Prejudice Caused by the Delay**

Courts have considered the third and fifth TRAC factors in conjunction with one another. See Muwekma Tribe, 133 F. Supp. 2d at 39.  The third factor instructs the Court to determine the realm in which the delay is occurring, i.e., economic verus human health and welfare, while the fifth factor instructs the court to assess the "nature and extent of the interests prejudiced by the delay."  TRAC, 750 F.2d at 80.   Thus, "[d]elays that [are] altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1157 (D.C. Cir. 1983).  Moreover, delays that place the plaintiffs in serious financial jeopardy are likewise unreasonable.  See Air Line Pilots Ass'n, 750 F.2d at 81 (five year delay in determining unemployment assistance payments).

The plaintiffs argue that these two factors weigh in their favor because the Coast Guard's delay continues to adversely affect the pilots' livelihoods.  Pls.' Mem. at 18.  In addition, the plaintiffs assert that the delay in the ratemaking has safety components because "pilots cannot be consistently undercompensated without a spillover into their ability to provide necessary services

---

[13](...continued)
delayed," id. § 706(1).  Because no statute restricts judicial review of the BIA's recognition determinations to the Courts of Appeals, compare TRAC, 750 F.2d at 77-78, the district court had jurisdiction under 28 U.S.C. § 1331 ("federal question") to determine whether the BIA was in violation of § 555(b), and, if it was, to issue an appropriate order pursuant to § 706.

Id. at 1099-1100.  The District of Columbia Circuit made clear in Mashpee that an unreasonable delay claim under the APA does not need to be based upon a "mandatory" duty.  Thus, the defendant's contention that the plaintiffs have failed to state a claim because there is no mandatory duty to act has no merit.

Moreover, to the extent that the defendant argues that the case should be dismissed under Fed. R. Civ. P. 12(b)(1) because the delay was not unreasonable, Def.'s Mem. at 8-13, this inquiry, a TRAC standard factor, is necessarily fact driven and not appropriately resolved on a motion to dismiss under 12(b)(1).  Mashpee, 336 F.3d at 1100 ("Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court.").  For these reasons, this Court must deny the defendant's motion to dismiss.

and equipment." Id. at 19.  Moreover, the plaintiffs contend that there is no harm to shipping

companies who hire the pilots' associations, because shipping rates have tripled in the last year.

Id. at 20.  In opposition, the defendant argues that "the pilots are seeking more money, not a

regulation to improve the heath and welfare of the general population. . . . At the most the pilots

are claiming a diminishment in the amount of what will in any event be substantial

compensation."  Def.'s Opp'n at 15.

Despite the plaintiffs arguments to the contrary, their interests are purely economic.  For

example, in contrast to the plaintiffs' situation, the Muwekma court held that the plaintiff tribe's

interest in obtaining federal recognition was not purely economic because

> the lack of federal recognition denies members of the Muwekma Tribe access to federal
> programs implemented in an effort to improve the health and welfare of federally
> recognized tribes, including educational programs, health services and facilities, and safe
> water supply and water disposal systems for Indian homes and communities.

Muwekma, 133 F. Supp. 2d at 39.  Here, the plaintiffs contention is that they are not being paid

at the rates they believe they are entitled to receive.  And while the plaintiffs may be correct, that

does not mean that they are entitled to an order mandating agency action.  This is simply not the

type of economic impact that the District of Columbia Circuit concluded could place the

plaintiffs in serious financial jeopardy.  For example, this case does not even come close to

approaching the serious financial jeopardy that the plaintiff in Air Line Pilots Ass'n faced,

having had their claims for unemployment benefits unresolved for five years.  Air Line Pilots

Ass'n, 750 F.2d at 86.  Thus, because any delay associated with this rulemaking is primarily

having an economic impact, such delay does not demand an order compelling agency action.

Accordingly, these factors weigh in the defendant's favor as well.

**(D)     Whether Expediting the Delayed Action Would Affect Agency Activities of a Higher or Competing Priority**

The District of Columbia Circuit noted the importance of examining "competing priorities" in assessing the reasonableness of administrative delay.  In re Barr Lab., Inc., 930 F.2d 72, 75 (1991), the court refused to grant relief, even though all the other TRAC factors favored the plaintiff, where "a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain."   In Barr, the plaintiff was one of many corporations waiting for the Food and Drug Administration to act on their application to produce and market generic drugs.  Id. at 74.  The record in Barr was devoid of any evidence that the plaintiff had been treated differently from any other firm, or that "officials not working on Barr's matters . . . [were just] twiddling  their thumbs."  Id. at 75.  Rather, the delay was the result of limited agency resources.  Id.  Thus, the Court concluded that even if the delay was unreasonable, it could not grant the relief the plaintiff was seeking.  Id. at 76.

Here, the plaintiffs assert that"the Coast Guard [has never] presented any competent evidence that the Pilotage Office officials responsible for this rulemaking have other priorities that would prevent them from completing this rulemaking in accordance with their own regulations and representations to the pilots and the Court."  Pls.' Mem. at 20.  The defendant replies, however, that "not only would diverting greater Coast Guard resources to this rulemaking be disruptive of other agencies priorities, it would be unproductive."  Def.'s Opp'n at 16.  Specifically, the defendant notes that it needs the Martin Associates report before issuing the final rule.  Id.  Moreover, during this rulemaking, the Coast Guard notes that it has also been engaged in "the largest Coast Guard regulatory project ever, the promulgation of regulations

21

implementing the Maritime Transportation Security Act, 46 U.S.C. §§ 70101-70117."   Id.

"[B]y decreasing the risk of later judicial invalidation and remand to the agency, additional time spent reviewing a rulemaking proposal before it is adopted may well ensure earlier, not later, implementation of any eventual regulatory scheme." Sierra Club v. Thomas, 828 F.2d 783, 798-99 (D.C. Cir. 1987).  It is therefore entirely reasonable for the Coast Guard to await the completion of the Martin Associates report before issuing its supplemental notice of proposed rulemaking.  Doing so, only helps to ensure that the rule, if later challenged, was properly implemented and was not issued in violation of the APA.  In addition, this Court "[has] no basis for reordering agency priorities.  The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." In re Barr Lab., 930 F.2d at 76.  Based on the record before the Court, it must also conclude that the fourth TRAC factor weighs in the defendant's favor.

**(E)      Whether any Impropriety Explains the Agency's Failure to Act**

Regarding the final and sixth TRAC factor, "the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency actions is 'unreasonably delayed.'" TRAC, 750 F.2d at 80.  Here, the plaintiffs do not even attempt to argue that the agency has engaged in any impropriety that would explain its failure to act.  In fact, based upon this Court's conclusion that the agency's justifications for the delay are valid, no such inference could permissibly be made by the Court.  Accordingly, this factor must also be weighed in favor of the defendant.

In sum, it is clear that the plaintiffs have not satisfied the TRAC standard, having failed to demonstrate that the agency's issuance of a new final rule has been unreasonably delayed.  In

fact, the situation presented here is similar to the one faced by the court in <u>TRAC</u>.  In <u>TRAC</u>,

several non-profit corporations and public interest groups petitioned the Circuit Court for a writ

of mandamus to compel the Federal Communications Commission ("FCC") to resolve issues

regarding whether ratepayers may have impermissibly contributed to development expenses

incurred by a telephone company.  <u>TRAC</u>, 750 F.2d at 74.  The petitioners had earlier "filed a

Petition for Enforcement of Accounting with the FCC in which they requested that the

Commission determine whether AT&T had received excess revenues and, if so, that the FCC

order appropriate relief to the ratepayers."  <u>Id.</u> at 73.  Instead of directly acting on this petition,

"the Commission issued a Notice of Inquiry on October 1, 1979, soliciting comments on several

issues related to AT&T's earnings."  <u>Id.</u>  Despite the fact that comments and replies were filed

"by the end of 1979[,] [t]he Commission [had] taken no further action during the almost five

years since the filing of comments."  <u>Id.</u>  In addition, the agency had, on at least two occasions,

stated that it would have a recommendation by dates certain, but it failed to adhere to these

deadlines.  <u>Id.</u>  After the writ of mandamus petition was filed, the agency represented to the court

that it would have the matter resolved "on or before November 30, 1984."  <u>Id.</u>

        In denying the petitioners' request for a writ of mandamus compelling the agency to issue

a decision on their petition that had been filed with the FCC, the Circuit Court declined to even

apply the factors it delineated in <u>TRAC</u> for determining whether agency delay was "egregious

enough to warrant mandamus" "[b]ecause . . . the FCC [had] assured [the court] that it [was]

moving expeditiously on both overcharge claims."  <u>Id.</u> at 80.  However, "in light of the [FCC's]

failure to meet its self-declared prior deadlines for these proceedings, [the court held that] the[]

delays [were] serious enough [for it] to retain jurisdiction over [the] case until final agency

disposition." Id.  Accordingly, the Circuit Court ordered the agency to "inform [it] of the dates

by which the agency anticipate[d] resolution of both refund disputes[]" and to "advise the court

of its progress . . . [e]very 60 days thereafter." Id. at 81.[14]

    As in TRAC, in this case the defendant has assured the Court and the plaintiffs that it is

diligently attempting to expeditiously issue a new final rule.  And because there is no regulatory

or statutory mandate that the defendant should have already acted, and the plaintiffs have offered

no authority that would authorize the Court to order the defendant to act immediately, they are

not entitled to a mandatory injunction.

## V.    Conclusion

    For the foregoing reasons, this Court must deny both the plaintiffs' motion for summary

judgment and the defendant's motion to dismiss.  While the Court concludes today that the

defendant's actions do not amount to an unreasonable delay warranting the issuance of an order

compelling agency action, the Court is troubled by the length of time the rulemaking process has

taken.[15]  Although the defendant has made numerous assurances to this Court that the rulemaking

is progressing, it has failed to provide the Court with any sense of exactly when that process will

be complete and whether it will be issuing an interim rule or a notice of supplemental

rulemaking.  To ensure that the delay does not move into the realm of unreasonableness, this

---

[14] In a footnote, the Circuit Court noted that the agency had later indicated dates by which the matters would be resolved, one of which the court decided was not reasonable.  TRAC, 750 F.2d at 81 n.43.  Accordingly, the court required the agency to "explain in its first report . . . why resolution of this matter requires almost three years to complete . . . [and] [i]f petitioners are unpersuaded by the FCC's explanations, they may request this court to order an earlier resolution." Id.

[15] Although the defendant asserts that it has satisfied its obligation by issuing an interim rule, that rule itself expressly states that there are a number of "rate calculation issues" that remain outstanding and that a "full rate adjustment" will be made in a supplemental notice of proposed rulemaking.  68 Fed. Reg. 69,564, 69,568.  While this Court passes no judgment on the substance of the interim rule since that issue is not presently before it, it is hard to believe that the agency would even attempt to assert that the interim rule satisfies its regulatory obligations.

Court will heed the advice of the District of Columbia Circuit, which has expressly stated that "if [a] district court is unable to conclude that the delay to date has been unreasonable, then it may nevertheless retain jurisdiction over the case in order to monitor the agency's assurances that it is proceeding as diligently as possible with the resources available to it."  Mashpee, 336 F.3d at1102; see also In re United Mine Workers of Am. Int'l Union, 190 F.3d 545, 556 (D.C. Cir. 1999) (retaining jurisdiction until there was a final agency disposition).  Therefore, this Court will retain jurisdiction over this case until the defendants issue a new final rule .

Accordingly, within 30 days of the issuance of this opinion and accompanying order, the defendant shall inform the Court of the date by which the agency anticipates completing the pending rulemaking.  In addition, every 60 days thereafter until a final rule is issued, the defendant shall advise the Court in writing of the progress it has made to that end.  At anytime prior to the issuance of the final rule, any party may petition this Court for any additional relief as may be warranted.

**SO ORDERED** this day of 28th day of February, 2005.[16]

REGGIE B. WALTON
United States District Judge

---

[16] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.